IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES M. FOSTER,

                             Petitioner,                         OPINION AND ORDER

      v.

                                                       19-cv-656-wmc

ERICKA K. FOSTER,

                             Respondent.

Pending before the court is the August 9, 2019, petition of James M. Foster, which seeks an order under the Convention of 25 October 1980 on the Civil Aspects of International Abduction ("the Hague Convention") that would require his wife, Ericka K. Foster, to return their three children to him in Guatemala. (Dkt. #1.) James' petition is somewhat unique in that all of the Fosters were born in and are citizens of the United States, including their three children. Moreover, the Fosters were married in Wisconsin and spent the preponderance of their married life in Idaho, albeit interspersed with time in Colorado and substantial international travel. Still, because the Fosters lived as a family in Guatemala from August 2017 to February 2019, before Ericka returned to the United States with their children and then stayed without his permission, James maintains that their children should be returned to him and that the Guatemala courts should adjudicate any custody issues.

This court held a two-day bench trial on the petition on December 4 and 5, 2019. For the reasons that follow, the court concludes that petitioner failed to meet his burden of demonstrating that the children "habitually resided" in Guatemala before their removal

to the United States as required by the Hague Convention. As such, the court will deny the petition.

## FINDINGS OF FACT[1]

### A. Overview of the Fosters' Marriage

James Foster and Ericka Foster were both raised in Wisconsin, but met at a Christian camp in Colorado in 2001. They were married in Dodgeville, Wisconsin on May 31, 2002. At the time, Ericka was 23 and James was 24. The Fosters both testified that they entered intentionally into a conservative Christian marriage with Ericka "submitting" to her husband and James agreeing to love and care for her. Ericka testified that initially she felt that her input was asked for and considered, even if James ultimately made the decisions when they disagreed. Even so, there were early warning signs that James might view his role in their marriage as more than that of a benevolent spiritual leader. Within a year, James acknowledged one incident of physical violence against Ericka in which the police were called. After being charged and convicted, James was ultimately required to attend a class in anger management in order to have this record expunged, which he did, and it was. In addition, after objecting to their relatively quick marriage on the grounds of James' controlling nature, Ericka's family found themselves cut off for two years, and James seldom spoke to them after that. Overtime, Ericka further testified that rather than seek

---

[1] The court finds the following facts based on the testimony and exhibits offered at trial. In the opinion below, the court draws inferences from these factual findings in support of its legal conclusions.

her input first, James more and more would just decide, and when she wanted to discuss a decision, he would respond, "we're not having this discussion."

James and Ericka now have three children: "Steven" was born in Colorado on November 18, 2008, "Holly" and "Natalie" were born in Idaho on July 27, 2012, on June 2, 2015, respectively.[2] At the time of the hearing, the children were 11, 7 and 4 years old, respectively. With the exception of some travel of no more than a month on the part of the parents (either individually or as a couple), the children lived with both James and Ericka from their birth until February 10, 2019.

During their marriage, James and Ericka made their living as owners and operators of a real estate development company, Narrow Gate Properties LLC, at times living in homes they built for up to two years before flipping them. As a result, they have moved some twenty-two times during their marriage, mostly between the states of Idaho and Colorado, but also traveling for months at a time to fourteen different countries. Before children, the Fosters both participated in building homes, although James was more experienced in construction and increasingly took on the role of contractor as they had children, while Ericka took on more of the childcare responsibilities. The Fosters built and sold thirteen homes in Colorado and Idaho during this same period, while holding and renting out others. Ericka testified that the decision of when and whether to sell homes was made by James, largely driven by tax and market considerations. This is consistent

---

[2] In the parties' submissions, the children were identified by the initials S.A.F., H.J.F. and N.M.F. in order to protect the children's anonymity. In this opinion, the court will simply refer to them by the pseudonyms Steven, Holly, and Natalie.

with James' testimony, except that as an equal owner of the LLC business, he emphasized that Ericka always had input into, and they ultimately always agreed on, those decisions.

Ericka further testified that James discounted her opinions on their business in particular, because she did not understand the market and was less informed, something she did not dispute, although his dismissive tone could be hurtful. Ericka's testimony about James' lack of consideration of her opinions was generally supported by the testimony of other witnesses, including her friend in Guatemala, Christine Fiorito, her mother, Diane Homrig, a friend from Sandpoint, Idaho, Debra Kirk, and a mutual friend of the couple and real estate agent, Jean Davis. The latter was particularly credible, as she was not only the longtime real estate broker for the couple's business, but was closer to James than to Ericka. In contrast, James testified that he continued to consider his wife's views throughout their marriage, and they would make major decisions mutually.

### B. Time in Idaho

To the extent the Fosters' marriage had a locus, it was unquestionably in Idaho. They first resided there in 2003 or 2004 until roughly 2008, before moving back to Colorado for a couple of years. The Fosters returned to reside in Idaho again from roughly 2011 until October 2016. Through their business Narrow Gate, Ericka and James still own rental properties in the State of Idaho, although they never resided in either of those constructed houses.

In 2014, the parties traveled to Europe for several months, visiting Italy, Slovenia, Bosnia, Albania, Croatia, Turkey, Greece and Montenegro. Before departing, they sold the home they were living in at that time in Idaho, stored their belongings in Idaho, with a

plan to return at some point to use them, but did not have a concrete plan as to where they would live after this trip. While traveling in Europe, the parties looked at possible properties to buy and develop, particularly in Greece, but eventually returned to the United States instead, first to Wisconsin, then subsequently back to Idaho.

Ericka testified that there was a general understanding for much of their marriage that time in any particular home would be temporary, but as the family grew, they talked of staying put on a more permanent basis with respect to at least a few of their homes in Idaho. In particular, Ericka had the impression that they would end up staying beyond their usual two-year limit in their last home in Idaho, an impression that James had endorsed. Indeed, the Fosters' close friend and realtor, Jean Davis, testified that James seemed to share Ericka's view. However, when Davis brought an offer far exceeding their expectations on that home, James testified the offer was too good to pass up and they sold it in October of 2016, along with much of its contents. Instead of moving into another of their Idaho properties, however, the Fosters packed most of their belongings and stored them in a trailer, which was initially parked at a friend's house in Idaho, but eventually transported to the home of James' mother in Wisconsin.

### C. Initial Visits to Guatemala

The Fosters then traveled as a family to Guatemala in the fall of 2016, renting an Airbnb home for five weeks in San Pedro La Laguna, a town with a population of approximately 75,000, located in the Department or State of Sololá. James testified that he had previously traveled to Guatemala by himself, staying in San Pedro La Laguna in February 2016, for the purpose of exploring a possible family visit or even a move. James

was particularly impressed by its setting on a large lake and its active tourist industry, which included a large ex-patriot population.

After their visit to Guatemala, the family traveled to Mexico for two to three additional weeks. During this time, Ericka testified that James told her he was leaving the family to travel to South America alone because he was mad that she was not excited to travel internationally with three small children. Despite this exchange, however, the family traveled on to Belize for the holidays, where they met James' mother for an additional two to three weeks' stay.

On January 6, 2017, the family then returned to San Pedro La Laguna, renting a two-bedroom apartment on a month-to-month basis. By this time, the two oldest children were being homeschooled by Ericka. In addition, Ericka and James began taking Spanish lessons with Juan Wilson Sac Aju ("Wilson"). Although the children did not, the expectation was for them to learn Spanish through immersion. In January 2017, James experienced what was described as a fairly significant seizure, requiring follow-up medical exams and apparently an MRI at a Guatemalan hospital, although no specific diagnosis was ever made for its cause.[3] Ericka also testified that during this trip, she shared her view with James that Guatemala would not be a suitable place to make a permanent move. The parties departed Guatemala in April 2017 and returned again to Wisconsin, where both sets of grandparents still resided. While James testified that he told Ericka early on in their marriage that he would never live in Wisconsin again, Ericka testified that she continued

---

[3] There was some suggestion that James had a brain tumor or some other serious medical condition, but the evidence does not support such a finding, especially in light of his now almost three-year history of remaining seizure free.

to consider it "home base," often providing a place to launch or return from international travel.

### D. Time Back in Wisconsin

Beginning in early April 2017, the family lived in a two-bedroom RV parked in the driveway of James' mother's house in Wisconsin. James' mother apparently paid for the RV, although Ericka understood from James that he had reimbursed his mother for the expense. During their time in Wisconsin, James testified that the parties discussed returning to Guatemala and, more specifically, that Ericka created a "pros and cons" list in a notebook. Personally, James wanted to leave the United States because of government regulation, concern of a possible loss of religious freedom, and financial opportunities available in Guatemala, and he testified that Ericka largely shared these motivations. With Ericka balking at the move, however, James eventually returned to Guatemala alone in June 2017, with a plan to secure a more comfortable, larger place for the family to live in San Pedro La Laguna.

Once there, James sent Ericka information about living options, including photographs and location details. While Ericka testified that she received this information in Wisconsin, she was not being asked for her input. Based on a verbal commitment with the owner, Claus Rohman, James then rented a 2000 square foot house located on the lake for twelve months, which he claims Ericka approved. He also bought furniture and bikes.

By that point, James maintains that Ericka and he had jointly agreed to return to Guatemala. Ericka's testimony and contemporaneous text messages, however, paint a very different picture, indicating that Ericka did not want to live in Guatemala, but was given a

stark choice by James to remain married and return to Guatemala or remain in Wisconsin with the children and without James. A particular text exchange, dated July 23, 2017, illustrates her predicament:

> James: You have a choice to give me respect or not, 100 times per day. It's not supposed to be a choice based on my decisions or actions, it's a yes or no thing. If you don't choose to respect me, it's better for the kids not to see our relationship, they are better off without a father.

> Ericka: Ok. I can't be honest with you because you have always responded with threats of leaving us and I know how hurtful that would be especially to the kids so I can't say anything.

> James: You made your choices this year. To be there, to stay there, to surround yourself with the 2 most prominent women in your life that do not respect their husbands… you stayed behind. You Chose To Not Follow My Lead. I let you make those decisions, some you chose wrong. Correct your mistakes while you still can. And for the love of God, make a decision about me. Follow me wholeheartedly or stay there.

> Ericka: Don't put this on me, you can't even name me 1 woman who respects her husband, you didn't lead anything this summer. You said we could come back for the summer then you left. You left…you didn't even suggest or offer to buy us tickets with yours, you took your independence and said you absolutely couldn't stay in Wisconsin any longer, you left. Own it, don't put the blame on me.

> James: You said you were staying. You don't have the ability to follow me when you do it out of your own strength. When are you going to realize that? I bought that stupid camper, went to Wisconsin, went to get the trailer all for you, and now you point the finger and bitch! You own it. I served you, against what I wanted. Stay in your hellhole!

(Ex. 506.)

Left with no other option as she saw it, Ericka testified that she and the children boarded the plane in August 2017 to return to Guatemala with the hope that James would

grow bored with Guatemala and they would return to the United States, true to a pattern that had continued throughout their marriage. However, there is no dispute that she was not physically forced to travel back to Guatemala at this time or before any of her later return trips. At the same time, Ericka did not believe that their time in Guatemala would be "indefinite"; rather, in her mind, she was returning to Guatemala with the children to save her marriage and planned to stay only so long as it took for James to change his mind again.

### E. Return to Guatemala and Life in San Pedro La Laguna

On August 10, 2017, Ericka and the children arrived in Guatemala to begin living in the Claus rental home with James in San Pedro La Laguna, bringing toys and school books to last approximately six months. Around that same time, the Fosters also opened bank accounts in Guatemala, while continuing to maintain accounts in the United States and leaving other belongings, along with some $30,000 in gold, with James' mother.

In October 2017, the Fosters purchased approximately one acre of undeveloped land for approximately $30,000 through Narrow Gate. This land was located directly across the street from their rental house. James testified that the purchase was also a mutual decision and that the parties intended to build a main house on the property in which the family would live, while building other "tiny houses" to be available for rent. Ericka again testified that James made this decision without input from her.

Initially, James built a 10-foot wall around this property with razor and barbed wire on top of the cement wall and a gated entrance, in part to keep out locals and in part to give renters a sense of security. He then terraced the property to provide levels from which

each of four, planned tiny rental houses would have views of the lake.  With the assistance of local laborers, James did the bulk of the construction, with Ericka involved in the finishing touches of caulking, painting and making curtains.  Ericka also was involved in setting up house rentals through Airbnb, or at least in writing the descriptions for the website.

Before James could build a main house in which to live, however, the Fosters were forced to change plans due to Ericka's and some of the children's allergies to dust in the Claus rental home, so, instead, they placed two of the tiny houses next to each other and connected them by a temporary doorway that they could be separated later for renters. Combined, these two houses contained approximately 900 square feet of living space and an additional 400 square feet of decking.  Each of the tiny homes had a bedroom, bathroom and kitchen.  In one of the homes, Steven had a bedroom and the girls occupied a nook with bunk beds and storage area.  Ericka and James' bedroom was located in the other house, just feet away from the children.

In August 2018, even before the lease had ended with Claus, the family moved from their rental house across the street into the adjoining tiny houses.  Around this same time, Ericka and the children left Guatemala, traveling to Wisconsin for approximately five weeks, beginning on August 22 and returning on October 3, 2018.  During this time, James continued to work on the property, completing the two other tiny houses, with one finished in December 2018 and the other in January 2019, and renting them out through Airbnb. After that, any remaining plan to build a main house in which the family would live on the Guatemala property more permanently was not pursued.

The children were universally described in testimony as bright, happy and incredibly adaptable, having each other as closest friends.[4]  During their time in Guatemala, the two older children continued homeschooling.  In addition, they played at the construction site, helping James with projects, went to the beach, accompanied Ericka on trips to the market, and played with some neighborhood children (typically the children of Claus's girlfriend and the son of the Fosters' Spanish tutor Wilson).  Nevertheless, Ericka testified that this time was trying for a variety of reasons, including allergies in the rental home, frequent stomach bugs, the physical demands of shopping and navigating safe travel outside of San Pedro La Laguna, difficulty in finding uninterrupted time for homeschooling, and limited, meaningful connections to the larger community.

James minimized all of these concerns compared to the freedom and simpler lifestyle afforded them in Guatemala, testifying that he interacted with and cared for the children by engaging in their homeschool curriculum, cooking and playing with them.  While the evidence supports a finding that Ericka played the primary caretaking role, with James spending more time constructing the tiny houses and otherwise developing their property, James was also actively involved with the children as well.

Unfortunately, the children's understanding of Spanish was limited to basic greetings, although they willingly offered greetings to neighbors and other acquaintances, as James' mother, Judith Schellinger, who visited them in Guatemala on several occasions, testified.  Moreover, Ericka noted that while she and the children were gaining some

---

[4]  By agreement of the parties and the state court appointed guardian ad litem, the children not only did not testify, but played no informal role in any of the proceedings before this court.

familiarity with Spanish, the native population primarily conversed in Tz'uzujil, a Mayan language, for which they had no familiarity, and while the children would play with some local children, this language barrier impaired their ability to develop close friendships with most children in San Pedro La Laguna.

In the last two months of their stay in Guatemala, the oldest child, Steven, then 10, had also joined a soccer team coached by Claus, but even this was limited to some practices, having left before the start of the season. Ericka also testified that Steven engaged in that sport reluctantly, as his only option, because the other children had more experience and were more skilled. The girls were not involved in any organized activities. Ericka's friend, Christine Fiorito, a missionary who visited with the family for four to five hours on roughly a weekly basis during significant portions of their time in Guatemala, further testified to Ericka's and the children's lack of integration into the local *and* ex-pat communities.

In January 2019, Steven also started attending a local Christian school, which both of his parents hoped would immerse him in the Spanish language, as he was slow to pick it up. In enrolling him, Ericka had purchased a school uniform and paid a semester's worth of tuition. However, he only attended that school for approximately two weeks before leaving Guatemala with his mother.

In terms of access to medical care, the parties did not establish care with a doctor, but this appears to be consistent with the parties' approach to organized medicine in the United States as well, having opted not to vaccinate their children (other than for tetanus and hepatitis B before traveling to Guatemala) or to schedule regular, well-child check-ups. The children did see a dentist on a regular basis, but those visits occurred during their

return trips to Wisconsin. The parties testified to the children needing medical care on two occasions while in Guatemala, when Natalie fell, suffering a mild concussion, and Steven stepped on a nail, requiring a tetanus shot. Ericka testified to concerns about the limited nature of care available at the small clinics in San Pedro La Laguna, though James testified extensively and credibly to the availability of a hospital in a neighboring community for emergency situations, albeit located roughly an hour away or more by boat and bus.

Ericka also described two incidents of violence the family faced during their time in Guatemala. In January 2018, returning from a trip to Guatemala City in their neighbor Luis's 16-passenger van, the van was ambushed by a group of armed men. The men had constructed a road block by placing rocks and pieces of wood on a road that Luis normally would not have taken, but opted to take in light of repaving efforts on the main road. Ericka testified that she was awake and saw a gun pointed at her. James testified that he did not see any guns, though acknowledged that he had been sleeping. Once confronted, Luis was able to push one of the larger rocks out of the way with his van and drive through the remaining constructed barrier with none of the Fosters harmed. The second incident occurred during a hike in March 2018 with another family from Canada, in which they were all confronted and ordered to pay an excessive fee to access a public trail by two men with machetes. James testified that it is common for men to carry machetes and that they

were not actually threatening their safety, but the Canadians insisted that they turn around all the same.[5]

Finally, during their approximately eighteen months of living in San Pedro La Laguna from August 2017 until February 2019, the Fosters were required to leave and re-enter Guatemala every 90 days, having never become legal residents that would have allowed them to stay in the country more permanently.[6]  As a result, the records reflect that the children departed and returned to Guatemala with their parents on the following days:  November 6-7, 2017, and April 7-8, June 29- July 1, and December 27-28, 2018. (Ex. 505.)  For these trips, the family had to travel approximately twelve hours each way by bus and ferry to Tapachula, Mexico.  Ericka described these trips as very "disruptive." The children's visits to Wisconsin also aligned with some of the required 90-day departures:  April to August 2017, December 2017 to January 2018, and August to October 2018.  (Ex. 505).  In fact, Ericka described an incident during one of the trips in which she and the children intended to fly from Wisconsin to Guatemala, that she received some pushback at the airport because they did not have return tickets and were unable to demonstrate their plan to exit the country after 90 days.

---

[5] Ericka also testified to more general concerns with respect to the safety of travel and infrastructure in Guatemala, specifically pointing out the lack of seatbelts in buses and vans and the overcrowding of ferries, describing a specific ferry accident on the lake on which San Pedro La Laguna sits, that resulted in deaths while they were living there.

[6] There was another option to travel to Guatemala City and pay $25 for a 90-day extension, but that option was not necessarily more convenient given the travel challenges.  In addition, James did testify that he became a resident of Guatemala the week before the hearing in this court, although he remains a United States citizen.

Throughout this period, James and Ericka also maintained their drivers licenses in the United States, while neither had a license to drive in Guatemala. They also continued to file joint income tax returns in the United States, while neither James nor Ericka filed tax returns in Guatemala, nor did they apply for a work permit in Guatemala. Finally, the parties did not receive mail in Guatemala. Instead, since 2016, their mailing address for both personal and business purposes was the home of James' mother in Hartford, Wisconsin.

### F. Ericka and the Children's Return to Wisconsin

Ericka credibly testified that marital problems intensified during the fall of 2018, with James repeatedly telling her to leave. Similarly, James testified that around this time, Ericka began accusing him of infidelity. As context, James testified, and Ericka conceded to a certain extent, that her religious views made divorce unacceptable except in cases of infidelity by one of the spouses. In October 2018, Ericka claims that James threatened her life, telling her that he would bury her in or by a new septic hole that he was constructing on the property. James flatly denies making any such statement, acknowledging only making a joke with Guatemalan laborers on their property as to how he would deal with a worker who stole from him. Regardless, in a November 25, 2018, text, James sent the following message to Ericka, while they were both in, though on different sides of, the adjoining tiny houses:

> I will call Jeanie tomorrow. After she sells a house you can take
> the money and go start your life over. I dont want you here
> anymore, you are making me an angry person. The kids would
> be better off if you left them here, but I know you will not ever

do that, you are too selfish to objectively think about their best interests. Prepare for your future.

(Ex. 508.)[7]

In the morning of February 8, 2019, James and Ericka had yet another argument. While the exact content is in dispute, there is no dispute that Ericka accused James of having extramarital sex, and he confirmed it, although James now claims he only did so "to free" Ericka from any further marital obligations in her own mind, not because he actually cheated. After this exchange, James left the home, and returned to working on the property. Eventually, Ericka also left with the children. This was the last time James saw the children in Guatemala.

At 10:47 p.m. that evening, Ericka texted James, "We are fine and safe. I need some time to think away from you for a few days." (Ex. 3 at 2.) Either on the 8th or the next day (it was not entirely clear from Ericka's testimony), she sought counsel from a local missionary and assistant director of the school her son had begun attending, as well as from a pastor's wife, traveling to another city for that latter visit.

The next morning, February 9, 2019, at 8:50 a.m., James texted Ericka that he was "leaving now" and would be "back at 10:00 pm tomorrow" (*id.*), a message Ericka would have understood in context to mean that he was traveling overnight to the airport in Guatemala City with a driver to pick up friends traveling to Guatemala for a visit, and he would return by late on February 10. The parties then exchanged a series of text messages about the Airbnb business, with Ericka specifically asking if she needed to clean or gather

---

[7] For this and other text messages, the court has not corrected typographical errors unless necessary to determine meaning.

keys from guests who were expected to check out, certainly implying that she was or would be on the property. A few hours later, at 11:31 a.m. on February 9, James texted, "When are you leaving?" (*Id.* at 3.) Ericka did not respond.

The next day, February 10, in the morning, James texted Ericka, asking her repeatedly if she was at the house. Ericka did not respond to those questions, but she did ask James if he was back from Guatemala City, as well as indicated that the guests had left and another individual was cleaning one of the houses. At 3:13 p.m. that same day, after James had picked up the family friends from the airport and learned of Ericka's efforts to leave Guatemala, James texted:

> If you want to leave, you dont have to ask Jody to create a war so that someone pays you to leave. Buy plane tickets with STCU and leave. The war is in your head, dont expand it to all these other people. I told you what you wanted to hear so that you would feel free of your self written obligation to follow me around. Now you feel free, go find some lady to help you[.]

(*Id.* at 4-5.)

James testified that his use of the plural "tickets" in the above-quoted message simply meant multiple legs of her journey or round-trip tickets, but did not mean he was authorizing her to purchase tickets for the children as well. The court finds this explanation less than credible given their previous exchanges and their relationship to that point, as well as his earlier written acknowledgement that he knew she would take the kids. Regardless, the court credits Ericka's testimony that James would have understood that if she was leaving, the children would leave with her, given her primary parenting role *and* the fact that she only left the children for very short periods of time, except for traveling back to Wisconsin for her father's funeral. Moreover, the subsequent exchanges between

them on the afternoon and evening of February 10 reveals once again that James knew Ericka would take the children with her when she left.

For example, James wrote: "After you accept that things are the way they are, i hope that you let our kids have a father, or else you WILL destroy them"; Ericka "needed to go get some help, and that is not in [G]uate[mala]"; and "Why is Jody asking [A]manda to get you and the kids out of [G]uate[mala] without telling me?" (*Id.* at 5.) Similarly, for her part, Ericka wrote, "I think we need to talk about what this is going to look like if you want to be with the kids[.]" (*Id.*) Later that night, after James had returned to the property and witnessed that Ericka had taken valuables and cash, as well as some of her and the children's personal belongings, James texted, "You leaving?  You gonna sleep here again before you leave?" (*Id.* at 6.) Ericka did not respond to that message, but asked if Amanda was with him and suggested that maybe she could meet her.

The next day, February 11, 2019, James texted Ericka at 1:58 p.m., "You wanna tell me what your plan is?" (*Id.* at 6.) Ericka did not respond.  James texted again, "I guess its some kind of big secret?," and "Are you going to let me see the kids before you leave?" (*Id.*) Ericka did not respond. The next morning, February 12, 2019, Ericka sent a lengthy text, stating in part that she asked the children "if they wanted to talk to you and they said no." (*Id.*)  Later that day, Ericka and the kids departed Guatemala and flew to Wisconsin. Despite his qualms, James acknowledged never telling Ericka that she could not travel with the kids, although he only learned they were in Wisconsin when his mother informed him after she received a visit from Ericka.[8]

_____

[8] The text message records continue for another 22 pages, covering the timeframe from February

## G. Divorce Proceedings in the United States

Almost two months later, on April 5, 2019, James filed a divorce action in Idaho. (Ex. 8; Ex. 16 (second petition filed July 30, 2019).)  This filing appears to be the first time James asked for the children's return to Guatemala.  On April 17, 2019, Ericka filed her own petition for legal separation with minor children in Dane County Circuit Court in Madison, Wisconsin.  (Ex. 5.)  Ericka also moved to dismiss the Idaho action for lack of jurisdiction.  (Ex. 10.)  The brief in support of that motion in the Idaho court stated, "[s]he and the minor children resided in Guatemala from 2017 until February 2019, when they moved to Blue Mounds, Dane County, Wisconsin."  (Ex. 12 at p.2.)  Ultimately, the Idaho court dismissed that divorce action on the parties' stipulation.  (Ex. 11.)

On August 12, 2019, Ericka filed a formal petition for divorce, also in Dane County, Wisconsin.  (Ex. 18.)  In response to James' motion to dismiss that petition for lack of jurisdiction, Ericka filed a declaration, in which she stated that "[f]or more than two years

---

2019 into June 2019.  These records are tangentially material to the present dispute.  Even accounting for the acrimony that sadly can become a part of a broken relationship, however, the tone and substance of James' text messages are consistent with the kind of control and manipulation described by Ericka and other witnesses.  (*See, e.g.*, Ex. 3 at 8 (calling Ericka a "fool"); *id.* (telling her that the children "will see your self righteousness and run from it"); *id.* ("you are really screwed up in the head"); *id.* at 9 ("If you want anything from my Moms, you are going to give me a relationship with the kids.  It doesnt matter what a judge or attorney say or do. I will not physically give you anything or sign anything without it.  I promise you, there will be a warr[a]nt out for my arrest if you try to take assets without letting me have a relationship with them."); *id.* at 13 ("One day those kids will come back to me, and in that time it is going to hurt you as bad as you are hurting me.  Enjoy your control while you have it[.]"); *id.* at 14-15 (instructing her that she "better fix" the mail forwarding issue, and that "[i]f my mom doesnt get that debit card, I cannot eat you bitch!"); *id.* at 14 ("When we get before a judge, you are going to look like the terrible person that you[] are."); *id.* at 20 ("Seriously, you are a terrible parent."); *id.* ("Get over your anger or those kids are going to run into Hell laughing at you and your God."); *id.* at 25 ("You are a terrible person."); *id.* at 26 ("If you are gonna be a bitch, i dont want to talk to them."); *id.* at 28 ("I hope you burn in hell.").)

prior to February 14, 2019, the family resided in Guatemala. We own rental property there, which we lease through Air B&B." (Ex. 6 at ¶ 3.) Eventually, however, James conceded jurisdiction because he wanted to avoid a further delay in determining custody. (Ex. 13.) Even so, the Dane County Family Court Commissioner found that the parties could not stipulate to jurisdiction in Wisconsin, concluding that Guatemala was the "home state" of the children and rejecting Ericka's argument that their living in Guatemala was a "temporary absence." (Ex. 15.) On James' motion, the Dane County Circuit Court ultimately stayed the divorce action before it pending this court's determination of James' by then pending Hague Convention petition. (Ex. 21.)

## H. Safety of Women and Children in Guatemala Generally and Access to Courts

The parties both called expert witnesses to offer testimony about Guatemala's safety and, in particular, the safety of women and children. Ericka called Gabriella Torres, Ph.D., an anthropology professor at Wheaton College in Massachusetts, who is an expert on Guatemalan state violence, including gender-based violence. Torres testified to the challenges Guatemala faced in its post-civil war period, roughly commencing in 1997. Torres also testified to the increase in violence post-conflict, explaining that law enforcement does not function effectively due to a lack of resources, being overstretched given the sheer size of the territory for which they are responsible, and the integration of criminal organizations into the government and police. Torres also offered her opinion that the court system is overwhelmed, though conceding on cross examination that she had no formal opinion as to the state of the family law courts or, in particular, custody disputes.

Instead, the statistics she was familiar with primarily concerned the processing of domestic and sexual violence cases.

As for day-to-day safety, Torres testified that it was dramatically unequal based on the wealth of the individual, and whether they had the resources to pay for private, armed guards and bribes of public officials. While Torres also described ongoing sex discrimination against women in interpersonal spheres (e.g., within the family), she acknowledged the enactment of a Femicide Law roughly a decade ago, as well as subsequent training about that law provided to both police and judges, suggesting that sex discrimination, at least in public spheres, was less pronounced. Critically, Torres further conceded that she had limited knowledge of the impact, if any, of the refugee crisis and related criminal activity on heavy tourist and ex-pat areas like San Pedro La Laguna. Indeed, Torres testified to traveling for a short vacation to San Pedro La Laguna with her family as recently as 2007, though she does not feel safe in Guatemala generally and takes a number of precautions.

In rebuttal, James called Freddy Arnoldo Urizar Rangel, an attorney practicing in Sololá, Guatemala, where he is also a law professor. Mr. Rangel testified that the court systems in Guatemala -- and in particular, in the Department of Sololá, in which San Pedro La Laguna is located -- are now well equipped to protect women and children from domestic violence, including providing restraining orders. Rangel also testified to the low incident of homicides in Sololá in 2018 and 2019. Rangel further described the availability of family courts to determine custody disputes, including the ready availability of courts to decide the Fosters' custody dispute, with the caveat that a local family court would need a

"resolution" from this court granting the petition under the Hague Convention to return the children to Guatemala.[9]  Rangel also directed the court to the relevant portion of the Guatemalan code that recognizes the custody rights of both parents over their children. (*See* Ex. 31.)  Consistent with Rangel's testimony, James further testified that he attempted to file a custody proceeding in Guatemala, but was informed that he would need copies of passports, birth certificates, *and* the children to be present *in Guatemala* to file a custody proceeding.[10]  Until very recently, Ericka has refused to provide copies of the passports and birth certificates, and she has refused the return of their children to decide custody rights.

Other lay witnesses with experience in Guatemala generally, and in San Pedro La Laguna specifically, including missionary Christine Fiorito, testified that walking alone at night is not safe, and she needed to be extra vigilant at all times.  On the other hand, James' mother and James' friend, Tamala Timm Akl, testified that they generally felt safe and comfortable at least in the Town of San Pedro La Laguna.

Ericka also offered various official travel warnings from the U.S. Department of State and others, alerting of a state of siege since September for 2019 for parts of the country and a high degree of caution for travelers, but addressing neither the Department of Sololá generally, nor the Town of San Pedro La Laguna specifically.  (Exs. 523-528.)[11]

---

[9] Though he acknowledged on cross-examination that he did some legal work for James, Rangel denied ever representing James in any custody proceeding.

[10] James also testified that he has filed a petition with the protectorate general, alleging abduction, but provided no documentation of this action.

[11] James further called Rodolfo Alejandro De Leon, the "governor" of the Department of Sololá in Guatemala.  In his role as governor, De Leon is responsible for supervising the national civilian police.  De Leon testified to a low rate of crime in Sololá and described it as one of the safest departments (or states) in the country.

OPINION

The Hague Convention was enacted to protect children from wrongful, cross-border abductions and retentions, and to ensure parental rights of custody and access are honored by Contracting States. *See* Hague Convention, art. 1. Both the United States and Guatemala are parties to the Convention.[12] The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011, implements the Hague Convention in the United States, granting federal and state courts concurrent jurisdiction over Hague Convention actions. *Chafin v. Chafin*, 568 U.S. 165, 168 (2013). "The Act entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011) (citing *Abbott v. Abbott*, 560 U.S. 1 (2010)).

Because the Hague Convention presumes that abduction and wrongful retention are not in the best interests of children, it further presumes that the prompt return of abducted children will promote their interests and deter abductions and removals more generally. Hague Convention, preamble. Simply put, the Hague Convention presumes that an abducting parent is wrong. In exceptional circumstances, however, the Hague Convention acknowledges that the opposite may be true. *See* Hague Convention, arts. 12, 13, 20.

---

[12] *See* U.S. Dept. of State, "U.S. Hague Convention Treaty Partners," https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (listing signees to the Hague Convention; noting Guatemala entered the Convention on January 1, 2008).

The primary remedy for a violation of the Hague Convention is a return order. The purposes of a return order are (1) to restore the parties to their positions before the abduction and (2) to deprive the wrongful parent of any advantage that might otherwise be gained. However, a return order is neither a custody determination nor a comment on the merits of a custody dispute. Hague Convention, art. 16. Rather, it is an acknowledgement that an alternative jurisdiction is more appropriate to determine custody and access. Hague Convention, art. 13; *see also Norinder*, 657 F.3d at 530 (The court's "authority over Norinder's petition extends only to the question whether JRN was abducted and should be returned to Sweden; we do not sit to resolve a messy domestic conflict.").

The return order requirements are set forth in Article 3. In particular, an applicant must establish by a preponderance of the evidence that:

1) the child was habitually residing in the other State;
2) the removal or retention of the child constituted a breach of custody rights attributed by the law of that State; and
3) the applicant was exercising those rights at the time of the wrongful removal or retention.

Once the applicant has established a *prima facie* case, a court may refuse to issue a return order pursuant to Articles 12, 13, and 20. Material to the present dispute, Article 13 explains that the court is not bound to return the child if the person who opposes return establishes that:

1) the applicant was not actually exercising custody rights at the time of removal or had consented to or subsequently acquiesced in the removal or retention; or

2) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.[13]

With this overview of the Hague Convention, the court turns to the four, principal disputed issues presented by this case: (1) whether the children were habitually residing in Guatemala at the time Ericka removed them; (2) whether James was exercising his custody rights; (3) whether James consented or acquiesced to the children's removal from Guatemala and retention in the United States; and (4) whether their children would be exposed to grave risks if returned to Guatemala. Because it is dispositive here, this opinion primarily addresses the first issue, but will also briefly address the other issues for the purpose of providing a more complete record should there be an appeal.

## I. Habitual Residency

The Convention does not define the term "habitual residency," but case law in this country and others discourage reliance on traditional notions of residency or domicile unique to an individual country's laws to avoid a lack of uniformity in enforcement of the Convention. *See Norinder*, 657 F.3d at 533-34 (The meaning of "habitual residence must be based on the everyday meaning of these words rather than on the legal meaning a particular jurisdiction attaches to them." (internal citations and quotation marks omitted)); *see also Kijowska v. Hanes*, 463 F.3d 583, 586-87 (7th Cir. 2006) (same); *Holder*

---

[13] Article 13 also allows a court to refuse to order the return of a child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views. At trial, respondent did not pursue this exception, including with respect to the oldest child, who recently turned 11.

*v. Holder*, 392 F.3d 1009, 1019 (9th Cir. 2004) (explaining that "physical presence" is not sufficient to demonstrate a change in habitual residence).

The Seventh Circuit has outlined an approach for making this determination relying in substantial part on a case from the Ninth Circuit, which other Circuits have also followed. *See Koch v. Koch*, 450 F.3d 703 (2006) (citing *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001)).[14] Generally speaking, that determination turns on the parties' intent:

> [T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration. Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended. If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual

---

[14] Last week, the United States Supreme Court heard oral argument on two issues arising out of the affirmance of a grant of a Hague Convention petition by the Sixth Circuit, of which may well be informative on the principal issue before this court: "Where an infant is too young to acclimate to her surroundings, whether a subjective agreement between the infant's parents is necessary to establish her habitual residence under the Hague Convention." Petition for Writ of Certiorari, *Monasky v. Taglieri*, 139 S. Ct. 2691 (2019) (No. 18-935). (The petition and the various briefs are available electronically at https://www.scotusblog.com/case-files/cases/monasky-v-taglieri/ ?wpmp_switcher=desktop.) In light of the parties' positions before the Supreme Court, however, the ruling is unlikely to alter the outcome of this case given its unique facts. Specifically, if the Court were to adopt the appellant's position that an *actual* agreement by the parties is required to prove habitual residence, placing a higher bar on the parent seeking an order returning a child to that country, then the petition here would likely be summarily denied for reasons addressed below. Alternatively, if the Supreme Court adopts an approach similar to that of the Seventh Circuit's, determining shared parental intent without limiting that inquiry to subjective agreement, but also considering the parties' actions and other objective evidence to infer the parties' mutual intent, then this court will have already applied that standard as set forth below. It is reasonable, therefore, to assume that the outcome of the *Monasky* appeal will not change the outcome of this case. Regardless, given the requirement of promptness demanded by the Hague Convention, this court does not have the luxury of waiting for the Supreme Court to address these issues, which may well not be until June of 2020, nor has either party requested such relief.

> residence. On the other hand, one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period.

*Koch*, 450 F.3d at 713 (quoting *Mozes*, 239 F.3d at 1075-76).

For young children, like Steven, Holly, and Natalie, the Seventh Circuit instructs that the proper focus is on the intent of the parents, rather than on the children's acclimatization. *Koch*, 450 F.3d at 713. Moreover, the court's focus should be on the period of time when the parents last shared an intent. *Id.* at 712, 715; *see also Neergaard-Colon v. Neergaard*, 752 F.3d 526 (1st Cir. 2014) ("In the event the parents disagree as to their children's place of habitual residence, we look to the intent of the parents at the latest time that their intent was shared." (internal citation and quotation marks omitted)). Finally, as the parent petitioning for relief under the Hague Convention, James carries the burden to prove this shared intent by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(1)(A).

In inquiring into the parents' shared intent, "the representations of the parties likely cannot be accepted at face value," *Koch*, 450 F.3d at 713, but rather will require an examination of "all available evidence." *Id.* In other words, the court "should look at actions as well as declarations." *Id.* at 715 (quoting *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005)). To illustrate this, the *Koch* court described a range of cases with easy decisions at either end: "[A]t one end of the spectrum [are] families which jointly take all the steps associated with abandoning habitual residence in one country to take it up in another; in such a case, courts would generally be unwilling to let one parent's reservations about the move stand in the way of finding a shared and settled purpose." *Id.* "At the other end of

the spectrum are cases where the child's initial move from an established residence was clearly intended to be of a specific, delimited period; in these cases, courts have generally refused to allow the changed intentions of one parent to alter the habitual residence." *Id.* However, this case falls somewhere closer to the middle than to either extreme. In such situations, *Koch* and other courts focusing on the "habitual residency" requirement routinely consider at least the following three categories: (1) the parties' reasons for moving to another country; (2) the extent to which the parties abandoned their prior lives; and (3) the extent to which the parties established a life in the new country.

With respect to the first factor, courts generally rely on whether the move from one country to another was permanent, for an indeterminate period of time, for a conditional period of time, or for a delineated period of time. If the move was intended to be permanent or for an indeterminate period of time, courts appear more willing to find a shared intent to abandon a prior residence for that of a new country. *See Koch*, 450 F.3d at 706 (relying on parties' intent to stay in Germany until they had enough money saved to make a down payment on a home and purchase two automobiles and until the husband had obtained a management position to find that the children habitually resided in Germany). However, if the parties either intended to move for a delineated period of time (e.g., a sabbatical year or a three-year job transfer) or if the parties' move was conditional (e.g., an attempt to save the marriage), then courts are more inclined to find that there was no shared intent to abandon the prior residence and transfer residency to the new country. *See Mozes*, 239 F.3d at 1083 (discussing "academic year abroad" as a delineated period that weighed against finding abandonment of the prior country); *Neergaard-Colon*, 752 F.3d at

532 (parties' intent to reside in Singapore for a temporary period of three years weighed in favor of finding a lack of abandonment of the prior residency); *Ruiz v. Tenorio*, 392 F.3d 1247, 1257 (11th Cir. 2004) (weighing evidence that wife's agreement to move to Mexico "was clearly conditioned upon improvements in their marriage").[15]

Here, the Fosters initially traveled to Guatemala in the fall of 2016 and again in early 2017, to explore it as a possible place to live, while also traveling in Mexico and Belize. At that point, James and Ericka certainly had no *shared* intent to reside in Guatemala "habitually." The preponderance of the evidence suggest that this was still true when James returned to Guatemala alone in June 2017, despite his plan to find a larger and more comfortable place for the family to live. Indeed, James and Ericka agree, and their text exchanges confirm, that he left the family in Wisconsin without agreement from Ericka that she and the children would join him. As petitioner's counsel stressed in questioning, it is true that Ericka ultimately did board a plane with her children to Guatemala in early August 2017 of her own volition and without physical force, but the court credits her testimony, strongly bolstered by the July 2017 text message quoted above,

---

[15] In his post-trial brief, petitioner directed the court to a Third Circuit case in which the court reversed the district court's finding on habitual residence, explaining that the fact that the mother "did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where [the father] had found work." *Feder v. Feder*, 63 F.3d 217, 224 (3d Cir. 1995). The facts of this case are readily distinguishable, however, given that the overwhelming evidence discussed in the text above does not permit a finding of a "settled purpose" between James and Ericka to live as a family in Guatemala beyond a "trial period." Instead, the facts at issue here align more closely with the facts in *Ruiz* as set forth above, which resulted in which the Eleventh Circuit distinguishing *Feder* in its analysis and affirming a district court's denial of a petition under the Hague Convention. 392 F.3d at 1256-58.

that she agreed to return to Guatemala under an ultimatum from James: remain married and live in Guatemala or separate and stay in Wisconsin with the children.

At that point, Ericka had plainly *no* wish to live in Guatemala for any extended period of time; instead, her decision to return to Guatemala was the result of her attempt to save the marriage *and* her not unreasonable belief that James would want to move again in time, or at least give in to wanderlust, as he had throughout their almost seventeen year marriage. As Ericka credibly testified, she simply hoped to wait out James' then fascination with Guatemala. Further, implicit in her decision, was the thought that if, for the first time, James were to put down real roots in a foreign country, Ericka would have to decide whether or not that was tolerable for her and their children. Whatever James' hopes or intent may actually have been, therefore, the parties had not formed a *shared* intent to reside habitually in Guatemala at the time Ericka returned with their children in August of 2017.[16] Rather, to paraphrase the Eleventh Circuit's apt summation in *Ruiz*, in affirming the district court's finding that the wife's return to Mexico in that case "was only an effort to save the marriage," and just as the Fosters here, the two never had a shared intent to make Mexico the habitual residence of their children, but rather that the family was in limbo during that time. 392 F.3d at 1250.

---

[16] In fairness, James points to statements Ericka later made (or at least her counsel made in briefing and she reviewed) in the divorce proceedings in Idaho and Wisconsin that would arguably support a finding the children were residing "permanently" in Guatemala. The court, however, places little weight on these statements where the term "residence" arguably had a different, specific meaning under United States' law. Moreover, the court notes that James similarly made "residency" statements pertaining to the divorce proceedings, which cut against finding an intent to reside habitually in Guatemala. (Ex. 3 at 21 (April 29, 2019, text message from James to Ericka, in which he stated "Wisconsin will throw out your case, we are residents of Idaho until you have 6 months there").)

As quoted above, however, the court must also consider the possibility that even though a mutual intent to abandon a residency and take up another had not be formed "at the moment of departure; it could [have] coalesce[d] during the course of a stay abroad originally intended to be temporary." *Koch*, 450 F.3d at 713 (quoting *Mozes*, 239 F.3d at 1075-76). Accordingly, the court turns to the two other, generally recognized categories: the extent to which the family abandoned their lives in the prior country and established lives in the new country. Depending upon the facts in an individual case, courts have considered a number of objective actions in determining whether the parties intended to abandon their prior residence. Here, the Fosters sold the Idaho house they were living in and mutually considered home even before their initial visit to Guatemala in October 2016. Normally, this action would weigh in favor of finding an intent to abandon the prior residence. *See, e.g.*, *Koch*, 450 F.3d at 716 (noting that the Kochs had no home to return to in the United States in finding a shared intent to habitually reside in Germany); *Norinder*, 657 F.3d at 534 (relying on fact that the mother did not retain a home in the United States as support of a finding that the parties intended to abandon the United States for residency in Sweden). However, given the parties' history of frequent sales of homes and numerous moves, coupled with James' testimony that they sold the house in Sandpoint, Idaho, *not* because they had a shared plan to reside anywhere else in particular, and at that time certainly *not* because of a specific shared intent to move to Guatemala, but simply because they had received a price that was too good to pass up, which renders the weight of this home sale relatively insignificant here.

Instead, as in the past, the sale of their home provided the family another opportunity for further travel and exploration, not a shared intent to abandon Idaho, particularly if Ericka's intent is considered, which it must be. Indeed, in 2014, just two years before their October 2016 trip to Guatemala, the parties had also sold a home in Idaho, packed up their belongings, and traveled throughout Europe for several months without any shared intent to abandon Idaho and transfer their residency to another location, however much James saw it as an opportunity to explore this possibility as they travelled. *See Holder*, 392 F.3d at 1017 (fact that family previously had several-year stay in Japan and then returned to the United States bolstered inference that the parties' subsequent time in Germany was not a habitual residence). Notably, the Fosters never sold their rental properties in Idaho, still linking them financially to that state and providing ready options for a home to live in should they opt to return.

As for the extent to which the parties moved their personal belongings to the new country. The evidence reflects that the Fosters merely brought suitcases containing toys, clothing and school books, but did not move furniture, automobiles, or other valuable, personal belongings. In fact, while they sold some of their belongings, James and Ericka packed up their family heirlooms, including furniture Ericka's father had made for them, and other valuables, including $30,000 in gold, and stored them in Wisconsin at James' mother's home. *Mozes*, 239 F.3d at 1082 (considering "economic base" of family in determining habitual residency). This is in contrast to cases finding abandonment of a habitual residence in favor of a new one. *See, e.g., Koch*, 450 F.3d at 706-07 (noting that "Antonia took all of her personal belongings with her to Germany" and that "Dane took

nearly all of his possessions" in finding an intent to abandon the prior residency); *Norinder*, 657 F.3d at 534 (relying on fact that the mother had "at least 80% of her personal items shipped to Sweden in July 2008, including two automobiles" to support finding that she intended to abandon the United States).

In addition, throughout their time in Guatemala, the Fosters maintained and used bank accounts in the United States.[17]  Indeed, while both were *in* Guatemala, James sent Ericka a text instructing her to use money in their U.S. credit union account to purchase plane tickets as late as her February 2109 departure from Guatemala.  *Compare Koch*, 450 F.3d at 707, 716 (noting that the Kochs closed all of their bank accounts in the United States before moving to Germany in finding intent to abandon United States), *with Ruiz*, 392 F.3d at 1254 (relying on fact that the mother "retained bank accounts in the United States" to support a finding that there was no shared intent to transfer habitual residency to Mexico).  The parties also forwarded their mail within the United States *throughout* their joint time in Guatemala.[18]  *See Ruiz*, 392 F.3d at 1254 (relying on fact that the mother "had her American mail forwarded to an American address and not to Mexico" to support a finding that she did not intend to reside in Mexico).   Finally, the parties continued to pay taxes in the United States and maintained their Idaho drivers licenses.  These actions

---

[17] In fairness, the Fosters did open two bank accounts in Guatemala in the fall of 2018, which provides some support for a finding that they intended to reside in Guatemala.  *See, e.g., Koch*, 450 F.3d at 716 (relying on the fact that the couple "opened a savings plan" in Germany to support a finding of a shared intent to transfer residency to Guatemala).  Unlike the Kochs, however, as noted above, the Fosters also continued to maintain multiple bank accounts and other assets that could have been easily liquidated in the United States.

[18] More recently, it appears that *James* now has his mail delivered in Guatemala.

all weigh in favor of finding a lack of shared intent to abandon the United States for Guatemala.

In addition to these concrete actions (or lack thereof), the court notes Ericka's and the children's frequent return trips to Wisconsin during their time in Guatemala. After returning to Guatemala from Wisconsin in August 2017, Ericka and the children had two more extended visits to Wisconsin over the next 16-month period of time. (Ex. 505 (1 month visit from December 2017 to January 2018 and 5-week visit from August to October 2018).) Ericka also returned for a two-week visit when her father passed away. These frequent return trips make sense in light of the broader context of this case -- unlike the vast majority of Hague Convention cases -- involving parents who both are citizens of the United States, as well as their children, with extended family in the same state.

Of course, an all-American family like the Fosters could still decide to move to another country for an indefinite period of time, or even permanently, but here: (1) James and Ericka were also born and raised in this country, as were their children;[19] (2) at least Ericka and the children continued to make fairly frequent trips back to the United States over a compressed period of time to maintain those ongoing familial connections; and (3) *none* of them ever bothered to establish legal residency in Guatemala throughout their stay, despite this meaning a fairly arduous two-day roundtrip by boat and bus with young children in tow every ninety days.

---

[19] The youngest child, Natalie (now age 4), spent her first year in the United States, before the Fosters started traveling internationally again, but even she has spent roughly half of her young life in this country, and the two older children have both spent most of their lives in the United States.

While the court noted above that the legal definition of "residency" is not determinative of the "habitual residency" question under the Hague Convention, courts commonly consider the legal residency status of the parties in the new country. *See, e.g.*, *Mozes*, 239 F.3d at 1082 ("Michal and the children left for the United States with a temporary visa, casting considerable doubt on whether they would be allowed to remain here indefinitely even if they wishes to"); *Koch*, 450 F.3d at 707, 716-17 (noting that the father "obtained a three-year renewable work permit, the longest permit available" in Germany; also noting that there was no evidence that the parties sought legal status for the mother, a German citizen, in the United States); *Norinder*, 657 F.3d at 534 (relying on the fact that the mother "applied for and received permanent residency status in Sweden" as evidence supporting a finding that she intended to transfer her habitual residency to Sweden); *Neergaard-Colon*, 752 F.3d at 532 (noting that the father "did not pursue permanent resident status for his family in Singapore); *Ruiz*, 392 F.3d at 1258 (noting that "no one attempted to obtain permanent residence in Mexico for Melissa and the children"). Here, only James ever secured residency status, and even then only a week before the trial in this court. Nor was there any evidence that the Fosters even *considered* taking steps to secure a longer-term permit to stay in or become residents of Guatemala during the entire time the family lived there from roughly August 2017 to February 2019, despite all of them having to leave Guatemala every 90 days or travel to Guatemala City and pay $25 to secure an extension. This failure also reflects the status of tourists on an extended visit, rather than of a family intending to stake roots in a new country.

Against these findings, and Ericka's demonstrated, growing resistance to ever settling down in Guatemala indefinitely, much less permanently, the evidence at trial also strongly cuts against finding that the Fosters ever shared an intent to abandon their residency in the United States. *See, e.g.*, *Mozes*, 239 F.3d at 1082 (the fact that prior to the family's one-year move to the United States, the mother "had never lived in the United States," "all of her life and the lives of the children had been spent in Israel," and "[a]ll of the family's relatives were there," supports finding that there was no shared intent to abandon Israel for the United States).

Finally, courts consider the efforts the parties made to establish lives in the new country. The purchase of a home or renovation of a home typically is a strong marker of an intent to transfer residence to the new country. *See, e.g.*, *Mozes*, 239 F.3d at 1083 (noting that renovating home in new country and planning to purchase another home were the sort of "objective actions that ordinarily lead courts to find a settled intent on the part of a family to take up habitual residence"); *Neergaard-Colon*, 752 F.3d at 532 (noting lack of purchase of a home in Singapore as supporting a finding that the parents did not intent to abandon the United States). Here, the Fosters did purchase property and built four tiny houses. However, even putting aside Ericka's credible testimony that this was not a shared decision, but rather one James made unilaterally, the facts is that: (1) a "main house" was never built on the property that the Fosters (or at least James) had planned to be their home; and (2) the Fosters had frequently purchased property and built homes for potential sale or long-term rental income through their business without necessarily intending to stay put. Indeed, even the decision to connect two of the tiny houses together for the

Fosters to live in was temporary, since it is undisputed that this was intentionally done in a way that they could be easily separated again for rental purposes. While James testified that he built the two tiny homes first, instead of a main house for the family in order to allow them to move quickly out of the Claus rental home to alleviate Ericka's and Steven's allergies, he then went on to build two more tiny houses on the property for rental, rather than build a main home for the family. All of this means that purchase of the property in San Pedro La Laguna did not necessarily signal an intent on the part of the Fosters to make Guatemala their habitual residence. If anything, the purchase of property and the building of the tiny, rental houses in a popular resort community supports a finding that it was done for business purposes at least as much as it supports a finding of any shared intent to reside in Guatemala habitually.[20]

Courts also look at the parties' development of a social life to support a finding of a shared intent to habitually reside in the new country. *See, e.g.*, *Koch*, 450 F.3d at 716 (relying on the fact that the couple developed a social life for themselves and their children). Certainly, James formed a community with the men that he worked with and with other ex-pats living and investing in property in San Pedro La Laguna, but Ericka's

---

[20] Courts also commonly rely on the obtainment of employment in the new country as objective evidence of an intent to habitually reside in the new country. *See, e.g.*, *Mozes*, 239 F.3d at 1083 (citing obtainment of full-time employment as evidence demonstrating a settled into the take up habitual residence in a country); *Koch*, 450 F.3d at 708 (relying on father's obtainment of employment with German company with no delineated time to support finding of habitual residency in Germany); *Norinder*, 657 F.3d at 535 (noting that mother "engaged in negotiations for a position at a hospital" in Sweden in finding shared intent to habitually reside in Sweden). Here, neither party obtained employment, but this is not surprising given their history. James engaged in a property development enterprise similar to that the Fosters had repeatedly undertaken in the United States. Still, given the nature of this business -- again, as reflected in the family history of frequently buying and selling property -- it does not necessarily signal an intent to reside in Guatemala.

community appears to be substantially more insulated. Other than the friends she made who were working as missionaries in the area or affiliated with Steven's religious school, Ericka lacked friends. She testified credibly about the language barriers with the native community, and her general unease with many of the tourists and ex-pat community. Moreover, as the court in *Mozes* warned, even a family's efforts to create ties in a new country could simply reflect the ordinary expectation of having a meaningful year abroad, rather than an intent to alter habitual residence. *Mozes*, 239 F.3d at 1083.

One of the trickier aspects of this case has been considering the family's actions and how those actions demonstrate a *shared* intent in light of the Fosters' marriage, since both seemed to have embraced the concept of a wife submitting to her husband, not just as her spiritual leader, but in all things, subject to the husband also loving and considering what is best for his wife and family. While Ericka's interests may not have been given equal weight in their marriage, the court finds that she was nevertheless steadfast in opposing any kind of longer-term move to Guatemala. Indeed, this was a regular source of tension in the marriage, both before and after the family made the move to Guatemala, so much so that James had to resort to an ultimatum to get her to come with the children and later encouraged her to leave if she couldn't fully embrace living there. The court recognizes that a family need not intend to stay in a new place indefinitely in order for it to be a habitual residence, but still there must be a shared intent to stay for some foreseeable future. *See Neergaard-Colon*, 752 F.3d at 531 (explaining that simply finding "that the parents agreed that the children would be present in a particular place for a particular period of time that had yet to elapse" is not the same as finding a shared intent to abandon

a prior habitual residence for a new one). Accordingly, the court has little trouble finding Ericka's wholly credible testimony that she returned to Guatemala in an attempt to save her marriage, knowing James' pattern of losing interest and moving on -- when coupled with the overall lack of objective evidence demonstrating an intent to abandon the United States for Guatemala -- is sufficient to conclude that James and Ericka had formed *no* shared intent for the family's habitual residence to be Guatemala *at any time* before or during their stay in Guatemala, including specifically right before Ericka removed the children from Guatemala to Wisconsin in February 2019. Indeed, on this record, the last time James and Ericka *had* a shared intent for a habitual residence within the meaning of the Hague Convention was when they lived as a family in their last home in Idaho.[21]

The Ninth Circuit in *Mozes* explained that even in the absence of a shared intent, "a child *can* lose [his or her] habitual attachment to a place." *Mozes*, 293 F.3d at 1081 (emphasis in original); *see also Koch*, 450 F.3d at 717 (citing *Mozes* in support). The court in *Mozes* cautioned, however, that courts "should be slow to infer in the absence of shared parental intent that children have changed their habitual residence through acclimatization." *Mozes*, 293 F.3d at 1075-76; *see also Koch*, 450 F.3d at 717-18. Here, in light of the children's extremely limited knowledge of both the dominant language of the

---

[21] In his post-trial brief, petitioner directed the court to a Southern District of Mississippi case, in which the court construed its obligations under the Hague Convention as *requiring* a determination of *a* habitual residence. *Walton v. Walton*, 925 F. Supp. 453, 457 (S.D. Miss. 1996) (determining that Australia was the only "legally justifiable" option among three locations). The Seventh Circuit, however, has recognized that it is possible for a child to have no habitual residence. *See Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006). Regardless, the Hague Convention simply requires this court to determine whether James as the petitioner has met his burden of demonstrating that the children habitually resided in Guatemala before Ericka's removal of them to Wisconsin. As to that question, the court determines that James failed to meet his burden by a preponderance of the evidence.

Guatemalan people *and* Spanish, almost no involvement in schooling or other meaningful social activities, and frequent return trips back to Wisconsin during a relatively short stay overall of roughly seventeen weeks, the objective evidence does not support a finding that their habitual residency transferred to Guatemala, particularly in the absence of a shared intent on the part of their parents to abandon the United States for Guatemala.[22]

For all of these reasons, the court concludes that James Foster failed to meet his burden of demonstrating by the preponderance of the evidence that the children were habitually residing in Guatemala.[23]

## II. Exercise of Custody Rights

In her pretrial briefing, Ericka purported to dispute whether James was exercising his custody rights at the time of the children's removal from Guatemala. *See* 22 U.S.C. § 9003(e)(2)(B) (providing that it is respondent's burden to prove this exception to the Hague Convention by a preponderance of the evidence). Under Guatemala law, if parents are married, they both have custody rights of their children. (*See also* Ex. 31.) At trial,

_____

[22] Courts often consider whether the children were attending school, or engaging in other social, cultural or religious activities. *See Mozes*, 239 F.3d at 1082-83. Here, given the parties' choice to homeschool their children, this is at most a neutral factor. Moreover, as Ericka testified, homeschooling was more limited in Guatemala, given that lack of a homeschool coop or community. Perhaps the best evidence of an intent to take up residency in Guatemala may be the Fosters' decision to send Steven to school with the purchase of uniform and payments of six months of tuition. Even then, Steven only attended school for a couple of weeks before Ericka left with the children for Wisconsin. Other than Steven's involvement in two months of soccer practice and purchase of a uniform, there were no other regular, structured activities in which the children engaged. Combined with the two older children having spent most of their lives in the United States and the youngest having no demonstrable interactions with *any* regular, structured activity in Guatemala, there is nothing to find that the children had become acclimatized to Guatemala.

[23] In light of the court's decision to deny the petition, an award of attorney's fees and costs under 22 U.S.C. § 9007 is necessarily denied as well.

Ericka presented evidence to support a finding that she played the primary caretaking role for the children, but James was living in the same home with the children, engaging with them with their homeschooling and in play, and cooking and providing for their other needs. On this record, therefore, the court easily finds that James was exercising his custody rights at the time of the children's removal from Guatemala. *See Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) ("The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever 'a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" (quoting *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007))); *see also id.* ("[A] person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." (internal citation and quotation marks omitted)).

### III. Acquiescence or Consent

Ericka also urges denial of the petition based on James' consent to her removal of the children to Wisconsin in February 2019. *See* 22 U.S.C. § 9003(e)(2)(B) (providing respondent has burden to prove this this exception by a preponderance of the evidence). "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place." *Walker*, 701 F.3d at 1122. While James disputed at trial that he consented to his children's removal, the text messages between Ericka and James reflects that he was fully aware that Ericka was taking the children with her in February of this year, and not only did nothing to protest or otherwise impede their removal, but contrary to his testimony at trial, he repeatedly acquiesced in

her doing so, including telling her in texts to just get on with it, as well as suggesting that she use their account to buy the plane tickets.  Accordingly, although the court agrees with James that he never gave his *express* consent for the children to leave with Ericka, he appears to have given *tacit* consent and certainly acquiesced in her decision to do so.

While this case, therefore, is "not a case of wrongful removal of the children; it is a case of wrongful *retention*."  *Walker*, 701 F.3d at 1118 (emphasis added).  Said another way, as in *Walker,* James consented, or at least acquiesced, to the children traveling with Ericka to Wisconsin on February 12, 2019, but he did not consent to Ericka retaining the children in Wisconsin indefinitely and refusing to allow them to return to Guatemala.   Indeed, Ericka conceded that there was no "shared agreement" to *move* the children from Guatemala to the United States in February of 2019.  (*See also* Ex. 27 at 50.)[24]  And at some point, certainly by April 2019, with James filing for divorce in Idaho and seeking the return of their children to Guatemala, he demonstrated his lack of consent to Ericka's retention of the children in the United States.  As such, the court concludes that Ericka has *not* met her burden of demonstrating that James actually consented or acquiesced to the children continuing to live in Wisconsin.

---

[24] Petitioner listed Ericka's deposition transcript as an exhibit.  During trial, the court indicated that it would be open to admitting select portions of that deposition as statements of a party opponent and directed petitioner to designate portions, if he so wished.  Petitioner did so, designating the last page of the transcript for that purpose.  (Dkt. #53, p. 50.)  Respondent objected to the court's consideration of her testimony on that page on the basis that petitioner did not raise it during Ericka's testimony during trial.  (Dkt. #56.)  However, the court did not limit petitioner to only designating those portions that were referenced during Ericka's testimony.  Regardless, the topic -- whether James consented to the removal and retention of the children in Wisconsin -- *was* explored during trial.  As such, the court will overrule respondent's objection, and grant petitioner's request to admit page 50 of exhibit 27.

**IV. Grave Risks**

Finally, Ericka contends that the court should deny the petition because there are grave risks associated with a return of the children to Guatemala. "The respondent must present clear and convincing evidence of this grave harm because any more lenient standard would create a situation where the exception would swallow the rule." *Norinder*, 657 F.3d at 535; *see also* 22 U.S.C. § 9903(e)(2)(A). Moreover, the Seventh Circuit has "stressed that the risk of harm must truly be grave." *Norinder*, 657 F.3d at 535.

Courts recognize, and Ericka pursues, two kinds of evidence in support of the grave risks exception: (1) safety concerns in Guatemala, particularly for women and children; and (2) James' prior incident of physical violence early in their marriage and threat to her life in October 2018. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) (Article 13(b) exception would cover "zone of war, famine or disease," as well as "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection"). In light of the court's finding that James failed to establish an element of his prima facie case, the court declines to review this exception in detail, other than to note that neither kind of evidence appears to support a finding of the quality of grave risks necessary to deny a Hague Convention petition.

As for the first theory, while Ericka demonstrated that parts of Guatemala are particularly unsafe given civil unrest and corruption, she failed to demonstrate that Sololá generally or San Pedro La Laguna specifically posed significant risks to her or the children's safety. No doubt, one would need to take precautions (for example, not walking alone at

night), but in this case, even crediting Ericka's description of the two safety issues the family encountered previously, the record does not support a finding of "grave risks." *See, e.g.*, *Vale v. Avila*, No. 06-1246, 2008 WL 11363822, at *7 n.4 (C.D. Ill. May 6, 2008) (rejecting "examples of crime in Venezuela" as meeting the high standard of showing grave risk of harm); *Salguero v. Argueta*, 256 F. Supp. 3d 630, 641 (E.D.N.C. 2017) (finding respondent failed to demonstrate that El Salvador was a "zone of war" for purposes of demonstrating grave risk); *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640 (S.D. Tex. 2017) (concluding that "general allegations of high criminal activity near Lagos de Moreno, Jalisco, Mexico" does not establish grave risk by clear and convincing evidence). Moreover, Ericka also failed to demonstrate that the family court system was too overtasked or otherwise unable to determine the parties' custody dispute so as to pose grave risks to the children's well-being.

As for Ericka's claim of domestic violence, the court notes initially that at trial, James, not Ericka, raised the incident of physical violence in 2003, which was early in the couple's marriage. While the court does not minimize that incident, Ericka did not rely on this incidence of physical violence in asserting that the court should deny the petition under the grave risks exception. Ericka did, however, testify to James threatening her life in October 2018, telling her that he would bury her in or by a new septic hole that he was constructing on the property. Here, too, the court does not diminish the seriousness of this allegation, but Ericka's testimony about this threat was limited and not supported by any contemporaneous evidence indicating that Ericka genuinely felt threatened by James.

Certainly, as detailed in the court's description of the parties' text exchanges following Ericka's removal of the children to Wisconsin, James expressed anger and frustration and also indicated that he would not abide by court orders, but stopped short of threatening to harm Ericka, much less their children, physically. Moreover, this record falls far short of the type of evidence typically required to invoke this exception. *See Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing district court's grant of petition and finding grave risks exception applied where mother was repeatedly beaten in front of her children, oldest child was also subject to physical punishments and the father had threatened the lives of his wife and children).

## ORDER

IT IS ORDERED that:

1) Petitioner James M. Foster's petition for return of children under the Hague Convention on Civil Remedies for International Child Abduction is DENIED.

2) Petitioner's request to admit page 50 of exhibit 27 into the record as the statement of a party opponent (dkt. #53) is GRANTED.

3) The clerk of court is directed to enter judgment in respondent's favor.

Entered this 18th day of December, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge